UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JUDITH STRATHMAN,

        Plaintiff,                                     Hon. Richard Alan Enslen

v.                                                    Case No. 1:04-CV-395

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 53 years of age at the time of the ALJ's decision. (Tr. 14). She successfully completed high school and previously worked as a manager of a dental office. (Tr. 14, 103, 108).

Plaintiff applied for benefits on March 18, 2001, alleging that she had been disabled since October 31, 1998, due to fibromyalgia, arthritis, degenerative disc disease, post-traumatic stress disorder, lupus, diabetes, blurry vision, depression, chronic diarrhea, and complications from surgery. (Tr. 102). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 28-41).

On May 21, 2003, Plaintiff appeared before ALJ Adrian Sannier, with testimony being offered by Plaintiff, Plaintiff's daughter, and vocational expert, James Engelkes. (Tr. 328-76). In a written decision dated November 28, 2003, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 13-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-6). Plaintiff initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

On October 30, 1998, Plaintiff was admitted to the hospital to undergo a laparoscopy[1] regarding her diagnosis of severe dysmenorrhea, dysfunctional bleeding, uterine fibroids, and adenomyosis. (Tr. 136-39). During this procedure, the doctor lacerated Plaintiff's left inferior epigastric artery. As a result, the doctor was forced to immediately perform a total hysterectomy. The doctor also attempted to repair the laceration to Plaintiff's artery. This attempted repair was unsuccessful and Plaintiff was forced to undergo a second surgery the following day. Plaintiff was discharged from the hospital on November 11, 1998. *Id.*

On July 14, 2001, Plaintiff completed a questionnaire regarding her activities. (Tr. 111-14). Plaintiff reported that she naps throughout the day because she experiences difficulty sleeping at night. (Tr. 111). She reported that she prepares "simple" meals and performs a rather limited amount of household activities. (Tr. 111-12). Plaintiff reported that a friend "comes in once a week for 4 hours to clean." (Tr. 112). She also reported that her daughter performs her shopping. *Id.* Plaintiff reported that she lacks the energy and concentration to read or perform any hobbies. (Tr. 113). On July 31, 2001, Plaintiff's daughter completed a similar questionnaire in which she provided responses consistent with those provided by Plaintiff. (Tr. 122-27).

On July 17, 2001, Plaintiff's treating optometrist reported that Plaintiff was suffering from diabetes with "vision fluctuations with uncontrolled blood sugar." (Tr. 155). The doctor also reported, however, that Plaintiff was not suffering from diabetic retinopathy and that "normal vision function should be regained as [Plaintiff's] blood sugar is stabilized." *Id.*

---

[1] Laparoscopy refers to the visual examination of the interior of the abdomen by means of a tube passed through the abdominal wall. *Schmidt's Attorneys' Dictionary of Medicine* L-32 (Matthew Bender) (1996).

On July 31, 2001, Plaintiff was examined by Carol Ducat Ph.D. (Tr. 268-73). Plaintiff reported that she was experiencing "extreme fatigue, slowed motor activity, very high anxiety (including some agoraphobia), mild phobic responses, hopelessness, tearfulness, memory impairment, inability to concentrate, decreased appetite, intrusive memories of the hospital trauma, [and] fear of contact with [the] physician involved." (Tr. 268). Plaintiff exhibited "compromised" mood and self-esteem, as well as "signs of depression and high levels of anxiety." (Tr. 271-72). Dr. Ducat diagnosed Plaintiff with post-traumatic stress disorder and rated her GAF score as 55. (Tr. 273).

On August 2, 2001, Plaintiff participated in a consultive examination conducted by Dr. H. D. Jones. (Tr. 274-76). Plaintiff reported that she was suffering from diabetes, "constant" numbness and tingling in her extremities, "borderline lupus," fibromyalgia, depression, and insecurity. (Tr. 274). Plaintiff exhibited a depressed affect and was "somewhat tearful and frightened in the beginning of the interview but did brighten considerably with just the gentlest of reassurance." (Tr. 275). The results of a physical examination were unremarkable and Plaintiff exhibited "normal range of motion of all joints." *Id.* Plaintiff exhibited no evidence of neurologic, motor, sensory, or cerebellar abnormalities. (Tr. 275-76). Plaintiff was diagnosed with well controlled diabetes and depression. (Tr. 276).

On August 20, 2001, Rom Kriauciunas, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 295-306). Determining that Plaintiff suffered from "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress," the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 296-304). The doctor determined,

5

however, that Plaintiff failed to satisfy any of the Part B criteria for this particular impairment. (Tr. 305). Specifically, the doctor concluded that Plaintiff suffered mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and experienced one or two episodes of decompensation. *Id.*

Dr. Kriauciunas also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 282-84). Plaintiff's abilities were characterized as "moderately limited" in five categories. With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited." *Id.*

On November 12, 2001, Dr. Ducat reported that Plaintiff suffered from post-traumatic stress syndrome as a result of her 1998 hospitalization and surgery. (Tr. 322). Plaintiff's symptoms included pervasive anxiety, extreme fatigue, nightmares about the trauma, re-experiencing the traumatic event, difficulty with short-term memory and concentration, and withdrawal from activities. *Id.* The doctor reported that Plaintiff's "defenses have been overwhelmed by the life-threatening and extended nature of the 1998 hospitalization which continues to haunt her." (Tr. 324). Dr. Ducat diagnosed Plaintiff with post-traumatic stress disorder and reported her GAF score as 50. (Tr. 322).

On March 7, 2002, psychiatrist, Dr. Roy Meland reported that he had been treating Plaintiff since November 9, 2000. (Tr. 307). Dr. Meland reported that Plaintiff experienced extreme neurofatigue, physical fatigue, general malaise, low mood, sadness, anxiety, attentional difficulties,

affective dysregulation, sleep disturbance, hopelessness, generalized disorganization of thought, retardation of movement, blunted affect, and constriction of normally appropriate emotive responses. The doctor diagnosed Plaintiff with (1) major depressive disorder, (2) post-traumatic stress disorder, and (3) somatoform disorder.

Dr. Meland reported that Plaintiff's subjective complaints are consistent with the objective results of his treatment and examination. The doctor further noted that Plaintiff's "concerns [are] valid and in context to her current life situation, and emotional state." Dr. Meland concluded that Plaintiff is "unable to maintain a 40 hour work week involving light or sedentary work as her current condition is decompensated to the point that vocational rehabilitation, work accommodation would be necessary for her to regain an appropriate ability to perform work duties, for any reasonable length of time." *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) diabetes mellitus (under good control and with no end organ damage), (2) high blood pressure (under good control and with no end organ damage), (3) post-traumatic stress disorder with a GAF of 50-55, and (4) status post hysterectomy. (Tr. 17). The ALJ further determined that Plaintiff's impairments neither alone nor in combination satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ found that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 17-20). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Not Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

---

be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform unskilled light work with a sit-stand option. (Tr. 19). As noted previously, the ALJ also expressly determined that Plaintiff suffered from post-traumatic stress disorder with a GAF of 50-55. The ALJ determined that Plaintiff could no longer perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can

9

perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Engelkes.

In rendering his decision, the ALJ stated that he relied on the vocational expert's testimony. (Tr. 20). However, an examination of the vocational expert's testimony, in conjunction with the specific findings of fact made by the ALJ, reveals that the ALJ's decision is not supported by substantial evidence. The relevant exchange between the vocational expert and the ALJ is as follows:

> ALJ: Okay. You want to respond to --
>
> VE: Sure.
>
> ALJ: -- some hypothetical questions I'm going to pose to you.
>
> VE: Okay.
>
> ALJ: Number one, let's say we have a Claimant who is 53, has a high school education or work record as you've detailed and assume she has pain and limitation of function to the degree of the testimony. Based on that set of facts could she do her prior work?
>
> VE: No.
>
> ALJ: Could she do any work at all?
>
> VE: No.
>
> ALJ: Hypothetical number two, same age, education, and prior work and the restrictions found in Exhibit 7F, are you familiar with that?
>
> VE: Well, I don't have them listed by exhibits, Your Honor.
>
> ALJ: Pull the date, please. Have you had a chance to look at that exhibit?
>
> VE: Yes.

ALJ: Okay. Assume the restrictions found in there, along with the Claimant's age, education, and prior work, could she do her prior work?

VE: Yes, I believe she could, Your Honor.

ALJ: Okay. Hypothetical number three, same age, education, prior work and an RF -- residual functional capacity for light work with a sit/stand option. Based on that set of facts could she do her prior work?

VE: Well, her prior work would certainly be within the purview of that restriction, Your Honor. It would be less than that restriction.

ALJ: Hypothetical number four, same age, education, prior work and a residual functional capacity for sedentary work with a sit/stand option. Based on that set of facts could she do her prior work?

VE: Yes.

ALJ: The next question, you're familiar with the DSM-IV?

VE: I am.

ALJ: And with the GAF scale as contained therein?

VE: Yes.

ALJ: If she had a GAF that ranged between $50^3$ and $55^4$ could she do that prior work?

VE: No.

ALJ: With that thought in mind we've got to go back to some other questions now.

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." *Id.* at 32.

[4] A GAF score of 51-55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

VE: Okay.

ALJ: We go back to hypothetical number two.

VE: Yes.

ALJ: Those are the restrictions of 7F.

VE: Yes.

ALJ: In response to that initially you said she can do her prior work --

VE: I did.

ALJ: -- but as pointed later the GAF would preclude it.

VE: Yes.

ALJ: So is there any other work she could do in response to hypothetical two?

VE: Yes, there would be work in my opinion, Your Honor, receptionist work, order clerk, scheduling clerk, all of which in my opinion would be compatible with those restrictions. Those are all at the semiskilled level. There would also be some at the unskilled level.

ALJ: How many at the semiskilled?

VE: At the semiskilled level, I would say 17,000 positions including also office manager, which I did not just elucidate a second ago.

ALJ: Okay.

VE: Then there would also be unskilled positions, Your Honor, that would be compatible too with those restrictions.

ALJ: And what would the unskilled jobs be?

VE: Well, I would say that some examples at least a dresser in the business services and clerical industry, ticketer in the wholesale and retail trades industry, gate and parking lot attendant in the public services industry. They would number in those examples approximately 12,000 in the State of Michigan.

ALJ: Okay. The next question. With a GAF of 50 to 55 could they do -- could she do those semiskilled jobs?

VE: No.

ALJ: So they're out?

VE: Yes.

ALJ: Could she do the 12,000 unskilled?

VE: Yes.

ALJ: Okay. Let's go to look at hypothetical number three again. That's the one that had --

VE: Yes.

ALJ: -- the residual functional capacity for light work with a sit/stand option.

VE: Yes.

ALJ: You indicate she could do her prior work, but --

VE: No.

ALJ: -- as found out, not on a mental basis.

VE: That's correct.

ALJ: You excluded it.

VE: Yes.

ALJ: Could she do any other type of work?

VE: Unskilled in my opinion, Your Honor, and examples would include general office clerk in the clerical industry, collator operator in the business services and clerical industry, sorter, folder in the laundry and dry cleaning industry. They would collectively, as examples number 16,000 in the State of Michigan.

ALJ: How about when you consider a GAF of 50 to 55?

VE: Yes.

ALJ: Could do?

VE: Yes.

ALJ: Okay. Let's go to hypothetical number four. That's the one that had a residual functional capacity for sedentary work with a sit/stand option. Could she do any other work under that set of facts?

VE: There would be, Your Honor. I would cite unskilled positions again, gate and parking lot attendant, a dresser and ticketer as all examples of sedentary unskilled with sit/stand option positions. And again they would number the 12,000.

ALJ: She -- it would be only unskilled work?

VE: Yes sir, but Your Honor, I need to make one clarification in my testimony.

ALJ: Yes.

VE: We've been talking a range of 50 to 55.

ALJ: Yes.

VE: I need to be clear that, in my opinion, if it is in fact 50 that none of these jobs would be compatible even at the unskilled level. If it is 51 to 55, in my opinion --

ALJ: Okay.

VE: -- that would be compatible with unskilled work.

As previously observed, the ALJ *expressly* determined that Plaintiff's GAF score was 50-55 and, furthermore, specifically referenced Plaintiff's GAF score in his hypothetical questions to the vocational expert. The ALJ also found that Plaintiff was limited to the performance of unskilled work. The vocational expert testified that if Plaintiff's GAF score was 51-55, there existed

14

a significant number of unskilled jobs which she could perform, but further testified that if Plaintiff's GAF score was 50, there existed no jobs which she could perform.

The inconsistency in the ALJ's decision is apparent. The range which the ALJ concluded represented Plaintiff's GAF score incorporates two separate and distinct classifications. To the extent that Plaintiff's GAF score is 50, she would appear to be disabled. To the extent, however, that her GAF score is 51-55, there exists substantial support for the ALJ's decision. This inconsistency involves a factual determination made by the ALJ and, therefore, cannot be resolved by this Court. The Court concludes, therefore, that the ALJ failed to satisfy his burden at Step V of the sequential process. Accordingly, his decision is not supported by substantial evidence.

b. Evidence of Plaintiff's disability is not compelling

While the Court finds that the ALJ's decision is not supported by substantial evidence, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

While the ALJ's decision is not supported by substantial evidence, neither is the evidence of Plaintiff's disability compelling. While Plaintiff's impairments are severe and impose significant restrictions, the record fails to support the conclusion that she is unable to perform any work activities. In short, the Court finds that the record evidence is insufficient to support either the Commissioner's position or Plaintiff's position. Accordingly, the Court recommends that this matter be remanded for further factual development pursuant to sentence four of 42 U.S.C. § 405(g).

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. The Court further concludes, however, that there does not exist compelling evidence that Plaintiff is disabled. Accordingly, it is recommended that the Commissioner's decision be **reversed** and this matter be **remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date: May 31, 2005                                             /s/ Ellen S. Carmody
                                                                            ELLEN S. CARMODY
                                                                            United States Magistrate Judge